UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                  :
RUSSI SUNTOKE,                    :
                                  :
            Plaintiff,            :          CIVIL NO.
                                  :
      v.                          :
                                  :          3:06 CV 1520(EBB)
PSEG POWER CONNECTICUT, LLC       :
                                  :
            Defendant             :
                                  :
```

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Russi Suntoke ("Plaintiff" or "Mr. Suntoke"), brings this action against PSEG Power Connecticut ("Defendant" or "PSEG"), alleging age and race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1) and (a)(4), and unequal pay in violation of 29 U.S.C. § 206d.  Plaintiff also claims promissory estoppel.

Currently pending before the court is Defendant's motion for summary judgment [Doc. No. 37] on all four of Plaintiff's counts. For the following reasons, Defendant's motion for summary judgment is GRANTED.

## BACKGROUND

This action stems from the termination of Plaintiff Suntoke's employment by Defendant PSEG Power in 2004.  Mr. Suntoke alleges that PSEG failed to fulfill its contractual obligations to him and

used a company-wide re-organization as a pretext for dismissing him on account of his age and race.  He contends that two incidents of pay inequality are evidence of discriminatory intent.

The court sets forth only those facts deemed necessary to an understanding of the issues raised in, and the decision rendered on, this motion for summary judgment.  The following factual summary is based on Plaintiff's Complaint ("Compl."), Defendant's Local Rule 56(a)1 Statement of Material Facts ("Def.'s 56(a)")[Doc. No. 39], Plaintiff's Local Rule 56(a)2 Statement of Material Facts ("Pl.'s 56(a)"), Plaintiff's Local Rule 56(a)(2)2 Statement of Disputed Issues of Material Fact ("Pl.'s 56(a) Disp. Facts"), Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Memo.")[Doc. No. 38], Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Memo.")[Doc. No. 42], and accompanying affidavits, depositions and exhibits, to the extent that they are admissible evidence. Consequently, such factual summary does not represent factual findings of the Court.  All facts stated below are undisputed (or have been deemed undisputed) unless stated otherwise.

Mr. Suntoke was employed as an electrical engineer at the Bridgeport Harbor Power Station from 1988 to 2003.  <u>See</u> Affidavit of Russi Suntoke ("Suntoke Aff.")(Pl.'s Ex. 2) ¶¶ 4, 12. He was initially hired by United Illuminating Company, which sold the Bridgeport Harbor Station, along with its power generation

business, to the Wisvest Corporation in 1999. <u>See id</u>. at ¶ 5.

Wisvest then sold the power generation business and Bridgeport

Harbor Station to PSEG Power in December of 2002. <u>See id</u>. at ¶ 7.

PSEG offered Mr. Suntoke the title of Staff Electrical Engineer in

Bridgeport, which he accepted. <u>See</u> Suntoke Aff. ¶¶ 7, 9.

     Defendant PSEG Power Connecticut is a subsidiary of PSEG Power

LLC, the parent company for nineteen fossil fuel power generation

facilities in the Northeast. <u>See</u> Affidavit of Karen Pfeifer-Jones

¶ 3 (Def.'s Ex. 3). PSEG Power LLC maintains a company-wide

Central Engineering Department in Newark, New Jersey. <u>See</u>

Deposition of Robert Parnell p. 35, September 24, 2007 ("Parnell

Dep.")(Def.'s Ex. 4). Before PSEG's deal to purchase Wisvest's

power generation business was finalized, a memorandum was sent to

Wisvest's employees stating that only "minor changes" would be made

to the successful organization of the power generation business.

<u>See</u> Memorandum entitled "Wisvest and PSEG: Working Together to

Build a Competitive Future," dated September 9, 2002 (Def.'s Ex.

5). The memorandum noted, however, that the organization of the

staff engineering support at the two Connecticut Stations was

different than the centralized organization at PSEG. <u>See id</u>. The

Bridgeport facility had a Staff Engineer Mechanical, a Staff

Engineer Electrical (plaintiff), and a Staff Engineer Controls.

See Suntoke Aff. ¶ 9; Parnell Dep. 19.[1]

In February of 2003, two months after the acquisition of the Wisvest business, PSEG Power LLC undertook a company-wide reorganization.  See Compl. ¶ 18.  The Directors of the PSEG plants made job eliminations on a consensus basis, but the ultimate authority to eliminate positions in Connecticut belonged to the Director of PSEG's Connecticut facilities, Robert Parnell.  See Parnell Dep. 27-28.  As part of the reorganization, PSEG eliminated from the Connecticut plants the three staff engineering positions, including Mr. Suntoke's.  See id. at 19.

Employees were given the opportunity to apply for more than sixty posted positions within PSEG Power, of which ten were in Connecticut.  Def.'s 56(a) ¶ 15 (admitted).  Plaintiff applied for one job, Plant Engineer Controls,  which went to the incumbent candidate.  See Deposition of Russi Suntoke 41-42, September 21, 2007 ("Suntoke Dep.").  Mr. Suntoke would not consider a position outside of Connecticut, because he was unwilling to relocate.  See id. 62-63, 111. Ultimately, PSEG discharged thirty-three employees company-wide as part of the reorganization, including Mr. Suntoke and one other employee at the Connecticut facilities. See Def.'s 56(a) ¶ 18 (admitted).   PSEG informed Mr. Suntoke of the termination of his staff position on June 4, 2003.  See Suntoke

---

[1]  In his deposition, Parnell refers to the position of Staff Engineer Controls as the "staff chemical engineer." Parnell Dep. 19.

Termination Letter (Def.'s Ex. 7).

The June 4 letter informed Mr. Suntoke that he could appeal the elimination of his position to an "Organizational Redesign Appeals Panel," which he did. See id.; Suntoke Aff. ¶ 13. In his letter requesting a meeting, Mr. Suntoke stated that PSEG and Wisvest had made an ongoing practice of hiring former employees as independent contractors to replace the work of full-time employees. See Organizational Redesign Appeal of Russi Suntoke, June 16, 2003 ("Redesign Appeal")(Def.'s Ex. 11). He also indicated that he was one year shy of the tenure needed to receive retiree health benefits. See id.; Suntoke Dep. 49. After Plaintiff met with Mr. Parnell, PSEG created a temporary, one-year position as "Planner" for Mr. Suntoke so that he could receive retiree health benefits. See Suntoke Dep. 25-26.  Mr. Suntoke agreed at that point to withdraw his appeal. See id. at 49, 107-08.

Mr. Suntoke agreed to a written offer of temporary employment as a planner, with an employment termination date of July 31, 2004. See Letter from Jeffrey W. Moore to Russi T. Suntoke, dated June 25, 2003 (Def.'s Ex. 12).  The temporary employment letter urged Mr. Suntoke to apply for other opportunities at PSEG through the internal job posting system, but he did not do so.  See id.; Suntoke Dep. 26, 58-59; Def.'s 56(a) ¶ 40 (admitted).  He retired with full retirement benefits on July 31, 2004.  See Def.'s 56(a) ¶ 40 (admitted).  Mr. Suntoke filed the current action on September

28, 2006.

## **STANDARD**

The standard for summary judgment is well established. A moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law", while an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000). Upon motion, and following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986). This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." FED. R. CIV. P. 56(c). The evidence of the non-moving party is to be believed, Anderson, 477 U.S. at 255, and "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party

opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). However, the non-movant may not rest upon the mere allegations or denials of his pleading, <u>see</u> FED. R. CIV. P. 56(e), and "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Instead, the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998). If the evidence is "merely colorable, or not significantly probative," then there is no issue for trial and summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50.

## **DISCUSSION**

### **A. Title VII and CFEPA**

In counts I and II of the Complaint, Plaintiff alleges that PSEG terminated his employment due to discrimination based on his age and race in violation of Title VII and CFEPA. The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his or her burden of proving that the adverse employment decision was motivated at least in part by an impermissible reason, i.e., that there was discriminatory intent. <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146 (2000); <u>Glaser v. Fulton-Montgomery Cmty. College</u>, 50 Fed. Appx.

17, 21 (2d Cir. 2002).

Employment discrimination claims brought under federal law or Connecticut state law are analyzed using the burden shifting analysis set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Ruscoe v. Housing Authority of City of New Britain, 259 F. Supp.2d 160, 166 (D. Conn. 2003). Under that analysis, a plaintiff first bears the burden of establishing a *prima facie* case of discrimination by showing (1) that he belongs to a protected class; (2) that he was qualified for the position; (3) that he suffered an adverse employment action; and (4) that the circumstances surrounding that adverse action give rise to an inference of discrimination.  McDonnell Douglas, 411 U.S. at 802-804.  See, e.g., Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the employment action. Id.  This burden is one of "production, not persuasion; it can involve no credibility assessment."  Reeves, 530 U.S. at 142. The defendant's burden is satisfied if the proffered evidence "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  If the defendant offers

such a reason, the burden shifts back to the plaintiff to show that discrimination was the real reason for the adverse action.  See id. That is, the plaintiff must "come forward with enough evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

Summary judgment may be appropriate in employment discrimination cases even though such cases often involve the employer's intent or state of mind.  The "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." McCloskey v. Union Carbide Corp., 815 F.Supp. 78, 80 (D. Conn. 1993)(quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829, 106 S.Ct. 91 (1985)). Courts should be cautious in granting summary judgment in these cases, "because direct evidence of an employer's discriminatory intent will rarely be found." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotations omitted).  In acting with caution, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Id.  However, at the same time, a plaintiff may not defeat a motion for summary judgment by relying on "purely conclusory allegations of discrimination, absent any concrete particulars." Meiri v. Dacon, 759 F.2d at 998.

Defendant PSEG admits that the first three criteria for establishing a *prima facie* case of discrimination have been met, and the only element at issue here is whether the circumstances surrounding the termination of Mr. Suntoke's employment give rise to a credible inference of discrimination. <u>See</u> Def.'s Memo. 15. According to Mr. Suntoke, the only two management level employees who lost their jobs during the reorganization were himself and Joe Lopes, a forty year old Hispanic male. <u>See</u> Pl.'s Memo. 16. Assuming this to be true for the purposes of this ruling, the analysis now shifts to Defendant's reasons for terminating Mr. Suntoke and whether Plaintiff can establish that these reasons were pretextual.

**No Evidence of Direct Discrimination**

Other than listing the names and ages of some other PSEG employees and outside contractors, Mr. Suntoke cites none of the following indicia of discrimination: (1) statistics indicating discrimination against a certain class of employee; (2) discriminatory comments; (3) a sudden and unexpected downturn in performance evaluations; (4) incidents of disparate treatment unexplained by legitimate business interests; or (5) other circumstantial evidence giving rise to an inference of discrimination. <u>See Chambers-English v. Unisys Corp.</u>, 2007 WL 256441 at 8* (S.D.N.Y. 2007). <u>See also</u> <u>Danzer v. Norden Sys., Inc.</u>,

151 F.3d 50, 56 (2d Cir. 1998)(downturn in performance evaluations); Duggan v. Local 638, 419 F.Supp.2d 484, 491 (S.D.N.Y. 2005)(statistical evidence of discrimination); Jackson v. Health Res. of Rockville, Inc., 357 F. Supp.2d 507, 512 (D.Conn. 2005)(discriminatory comments).    Instead, he relies on assertions such as "Defendant had no other reason to eliminate Suntoke's position other than as a direct result of his age ... and the fact that he is of Indian origin." See Pl.'s Memo. 11.

On the contrary, the uncontested evidence supports Defendant's assertion that the elimination of Mr. Suntoke's job was wholly a business decision.  As early as September 9, 2002, nine months before Mr. Suntoke's position was terminated, PSEG published a memorandum to Wisvest's employees placing Mr. Suntoke on notice that his position did not fit PSEG's structure and could be eliminated as part of the broader reorganization.  See Memorandum entitled "Wisvest and PSEG: Working Together To Build a Competitive Future" (Def.'s Ex.5).[2]  That notice came from PSEG and not from

---

[2]  The memorandum states: "PSEG will look for opportunities to provide services and support in all areas in the most cost effective manner and evaluate best practices from Wisvest and PSEG .... [I]n reviewing the organization structure at the Connecticut Stations it is similar to those at PSEG plants with the exception of the on staff engineering support.  Engineering Services for PSEG Fossil are provided by a central organization supporting all generating plants in the system.... The organization structure at the Connecticut Stations is similar to those at PSEG plants with the exception of the on staff engineering support.  Engineering Services for PSEG Fossil are provided by a central organization supporting all generating plants in the system." Memorandum entitled "Wisvest and PSEG:

Mr. Parnell, who was ultimately responsible for terminating Mr. Suntoke's employment during the reorganization. <u>See</u> Def.'s 56(a) ¶¶ 10-11 (admitted).  Mr. Suntoke's own submissions go into detail about the reorganization process, which took place in three separate rounds and included written notices and rounds of application and re-hiring on a company-wide basis. <u>See</u> Pl.'s Memo. 5-6, 15-16; <u>see also</u> "Fossil Operations Round III Selection Process Resource Package" (Pl.'s Ex. 10).  Mr. Suntoke himself admitted that he applied for only one position during the reorganization, and that the person who was retained for that position was the incumbent candidate who had significant experience.  <u>See</u> Def.'s 56(a) ¶ 16 (admitted); Suntoke Dep. 41.

Plaintiff did not explicitly complain of discrimination to the appeals board, although he now argues that the very act of appealing his dismissal is tantamount to claiming that he was discriminated against.  <u>See</u> Pl.'s Memo. 19-20; Pl.'s 56(a) Disp. Facts ¶¶ 3, 17.[3]  This is a flat misrepresentation of the appeal

_____

Working Together To Build a Competitive Future."

[3] The court notes that on two occasions Plaintiff's submissions regarding his appeal are incomplete and misleading. First, Plaintiff quotes the appeal instructions as reading that the process was "solely for employees who believed they had been discriminated against..." Pl.'s Memo. 20.  The well-placed ellipsis omits the second clause, reading that an employee may also file an appeal if he believed that he had "not been treated in a manner consistent with the organizational redesign process guidelines." Redesign Appeal (Def.'s Ex. 11).

This misrepresentation becomes even more glaring in light of the second intentional omission. Plaintiff's exhibits include

instructions, which read that an employee may appeal if the employee feels that he or she had *either* been "discriminated against" *or* had "not been treated in a manner consistent with the organizational redesign process guidelines."   Redesign Appeal (Def.'s Ex. 11).  Furthermore, in the narrative attached to the appeals form, Mr. Suntoke complained to the appeals board only that his work was being shifted to outside contractors and that this was "unfair" and "harsh," particularly due to the fact that he was only a year away from accruing the service necessary to earn full retiree benefits.  See id.  Plaintiff did not claim that he had suffered any racial or age animus on the part of Mr. Parnell or any other person in a position to influence his employment.   See Def.'s 56(a) ¶ 4 (admitted).  Nor does Plaintiff now allege any instances of overt racism or incidents when he was openly discriminated against due to his age.


**No Evidence of Pretext**

There is insufficient evidence in the record upon which a jury could determine that the choice to dispense with Mr. Suntoke's

---

only the first page of Mr. Suntoke's appeal, the page with the instructions and his signature, but not Mr. Suntoke's typed attachment.  See Pl.'s Ex. 12. Defendant's exhibit includes the entire appeal, including the identical first page with the instructions and Mr. Suntoke's signature, but also Mr. Suntoke's typed and signed narrative.  Mr. Suntoke's narrative makes no mention of discrimination, but instead complains about the policy of replacing full time employees with outside contractors. See Def.'s Ex. 11.

position during the reorganization was pretextual. Plaintiff's papers mention the races and relative ages of a few other employees and contractors who did not lose their jobs during the reorganization. See, e.g., Compl. ¶¶ 30, 31. But it is not enough, when accusing an employer of discrimination, to ask the court to infer animus based solely on the ethnicity or age of plaintiff's coworkers, particularly where those individuals are not similarly situated. Accord Chambers-English v. Unisys Corp., 2007 WL 256441 at *8 (S.D.N.Y. 2007)(granting summary judgment to defendant where plaintiff provided no evidence that her race played a part in defendant's failure to promote her), aff'd 2008 WL 4876836 (2nd Cir. 2008). The crux of Mr. Suntoke's argument is that, of the employees who held the three staff engineering positions eliminated at the Bridgeport station, the other two men were re-hired for other positions, while he was not. See Pl.'s Memo. 6.[4] The key fact is that the three men held different jobs. See Pl.'s Memo. 14.

Mr. Suntoke does not contest PSEG's assertion that it has not hired any permanent employee to replace him. See Def.'s 56(a) ¶54. Plaintiff argues that much of the work he used to do is now completed by outside contractors. See Pl.'s Memo. 16. Defendant does not dispute that some of the work has been done by outside

---

[4] One of the two re-hires, Frank Romano, is nearly 60 years old. See Pl.'s 56(a) ¶24.

contractors, but instead asserts that today the "overwhelming majority of the electrical engineering work at Bridgeport" is done by "architectural engineering firms that are engaged in two capital improvement projects." Def.'s 56(a) ¶ 56. The difference, for the purposes of this ruling, is immaterial.

Nonetheless, Mr. Suntoke cites the use of outside help as evidence of discrimination. In his submissions to the court, Plaintiff puts great weight on the notion that some percentage of his former duties were assumed by his former supervisor in Bridgeport, Robert Kish, acting as an independent contractor, several other "independent contractors," and for some period by a young employee as part of a rotating training program.[5] See Pl.'s Memo. 13, 16-19. In the context of the reorganization, none of these is evidence that the termination of Plaintiff's position was pretextual.

In the narrative he submitted with his appeal, Mr. Suntoke himself pointed out that Defendant had a long-standing policy of using former employees as contractors:

> PSEG and its predecessor company, Wisvest-CT, LLC,

---

[5] In his complaint, Mr. Suntoke also alleged that PSEG "hired" a "much younger" independent contractor, William Scarpa, to replace some of his electrical work at the Bridgeport Station. See Compl. ¶ 30. After discovery was conducted, Mr. Suntoke admits not only that he had no reason to believe that William Scarpa took over any of his duties at the Bridgeport Station, but that William Scarpa is in fact older than Mr. Suntoke. See Def.'s 56(a) ¶¶ 66-69 (admitted). See also Deposition of William Scarpa 7, 24-25, 34, September 24, 2007.

> have been and are continuing to retain the services of
> company retirees/ex-employees who have voluntarily
> severed from the company.  They are rehired either as
> independent contractors or through temporary placement
> agencies.  This has been an ongoing practice for years
> and is not resorted to only as a temporary stop gap
> measure to cover business peaks.

Redesign Appeal (Def.'s Ex. 11). Mr. Suntoke continues "[i]t seems strange that an existing associate should be involuntarily terminated while the above practices continue."  Id. Merely shifting the duties of a full-time employee to an outside contractor is not, without more, evidence of discrimination. Accord Waldorf v. Liberty Maintenance, Inc., 2007 WL 942103 at *8-9 (S.D.N.Y. 2007)(finding no age discrimination where the apparent motivation for replacing plaintiff with a younger worker was the cost of employment).  Mr. Suntoke proffers no reason why the application of a legal, long-standing business practice to him should now be evidence of discrimination.[6]

Regarding the younger employee, Robin Benson, while it is true that the replacement of an older employee by a younger employee can

---

[6]  In his deposition, Mr. Suntoke describes the relationship between the in-house electrical engineers and outside contractors while he was employed at PSEG:  "Once [planning] is done, either we give the job to the in-house electricians ....[if] there is adequate manpower in-house, or if there's not adequate manpower ... then we hire outside contractors.  As a practical matter outside contractors were practically a way of life at all these companies, whether it was UI or Wisvest or PSEG.  They were there, I would say, like 80 to 90 percent of the time.  The point being that most of these bigger, newer jobs were done by contractors, and the smaller things like putting out day-to-day fires were done by the in-house people."  Suntoke Dep. 14.

give rise to an inference of age discrimination, see Schnabel v. Abramson, 223 F.3d 83, 87 (2d Cir. 2000), just pointing out that a replacement is younger is not enough, in itself, to establish pretext.   See generally, Waldorf, 2007 WL 942103 at *8-9. Moreover, the uncontested facts show that Ms. Benson did not replace Mr. Suntoke on anything approaching a full-time basis. According to Mr. Suntoke's own submissions, Ms. Benson was a member of a training program and rotated between PSEG's Newark, New Jersey plant and the Bridgeport Harbor Station.   See Pl.'s Memo. 6.   The only periods plaintiff specifically identifies when Ms. Benson performed electrical work in Bridgeport are June 2003 and June or July of 2006 to September 2007, three years after Mr. Suntoke's position was terminated.   See id.  She spent significant time in New Jersey, rather than in Connecticut, and no trainee replaced her when she left.   See id. at 6, 13. Even taking Mr. Suntoke's averments as true, Ms. Benson did not assume Mr. Suntoke's duties on anything approaching a permanent basis.

＿＿＿＿After the termination of Plaintiff's position as Staff Engineer Electrical in 2003, Robert Parnell created a temporary job specifically to allow Mr. Suntoke to remain at Bridgeport Station an extra year so that his retirement health benefits could vest. See Letter from Jeffrey W. Moore to Russi T. Suntoke, dated June 25, 2003 (Def.'s Ex. 12).  This decision would seem to undercut Mr. Suntoke's discrimination claim; it could hardly be seen as evidence

17

of racial animus and demonstrates that Mr. Suntoke's position was not terminated for the purpose of saving on retirement benefits. Cf. Hazen Paper Co. v. Biggins, 507 U.S. 604, 612 (1993)(holding that it is not a violation of the Age Discrimination in Employment Act of 1967 to terminate an employee because the employee's pension will soon vest, although this may give rise to a cause of action under ERISA).  Mr. Suntoke retired with full retirement benefits, including health benefits, once the temporary position ended.  See Def.'s 56(a) ¶ 40 (admitted); Suntoke Dep. 58.

Plaintiff also contends that when he ultimately left PSEG in 2004, his severance pay was calculated incorrectly, and that this is evidence of discrimination.  See Compl. ¶ 36.  Defendant acknowledges the miscalculation, but asserts that the discrepancy in the severance calculation was an administrative mistake likely made because Mr. Suntoke did not leave employment when his staff job was completed, but stayed on another year.  See Def.'s 56(a) ¶¶ 48-49 (admitted).  Plaintiff does not contest Defendant's assertion that neither Mr. Parnell nor anyone else in a position to influence his employment had anything to do with the severance calculation.  See Def.'s 56(a) ¶¶ 51-52.  He offers no plausible reason why the severance issue is evidence of discrimination, other than his deposition testimony in which he claims that, if he received a different settlement than a younger employee who also lost his job in the reorganization, Joe Lopes, "then certainly it

is discrimination."[7]  See Suntoke Dep. 69.

PSEG produced substantial testimonial and documentary evidence that Mr. Suntoke's job was one of more than thirty eliminated as part of a company-wide reorganization following the acquisition of the company that employed him, and Plaintiff provides no credible evidence that PSEG used the reorganization as a pretext to dismiss him, other older employees, or other racial minorities. Therefore, Defendant's motion for summary judgment as to Counts I and II is GRANTED.


## B. Unequal Pay

Plaintiff claims unequal pay in violation of 29 U.S.C. § 206d, which prohibits gender discrimination in pay.  In the complaint, Mr. Suntoke states that he received a severance package payment that was lower on a prorated basis than a younger employee, Joe Lopes.  See Compl. ¶ 36.  Defendant points out that Joe Lopes is male, and that therefore §206d does not apply. See Def.'s Memo. 30. As discussed above, Defendant also admits an administrative error in the initial severance calculation.  See Def.'s 56(a) ¶¶ 48-49; Def.'s Memo. 23.

-----

[7] In a somewhat contradictory fashion, Plaintiff compares himself to Joe Lopes as evidence of both race and age discrimination.  Plaintiff cites the fact that both men are minorities as evidence that PSEG discriminated against minorities, see Pl.'s Memo. 16, but also cites the fact that the younger Joe Lopes had his severance calculated differently as evidence of age discrimination.  See Compl. ¶ 36.

Plaintiff does not dispute that Joe Lopes is male.  Instead, plaintiff changes his argument and now asserts that he suffered unequal gender pay compared with Robin Benson, the female trainee who started working for PSEG after Mr. Suntoke's position as an engineer had been terminated.  See Pl.'s Memo. 27-28.  Plaintiff states that Ms. Benson's hourly wage in 2007 was $1.02 higher than his 2003 hourly wage.  See id.  The comparison is unavailing; not only does he cite Ms. Benson's pay from four years after he stopped working as an engineer, but Mr. Suntoke himself points out that PSEG raised the salaries of engineers who stayed on after the reorganization.  See Pl.'s Memo. 14-15.  Moreover, it has already been established that Ms. Benson was not similarly situated to Mr. Suntoke due to the fact that she worked in two states under a different job description than Mr. Suntoke.

Defendant's motion for summary judgment as to Count III is GRANTED.


## C. Promissory Estoppel

Plaintiff claims that PSEG broke a binding promise to "provide [him] with a training position upon the end of his temporary assignment."  Compl. ¶ 50.  "Under the law of contract, a promise is generally not enforceable unless it is supported by consideration."  D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 520 A.2d 217, 221 (Conn. 1987).  Neither side, here,

asserts that there was any consideration for PSEG to offer Mr. Suntoke a second, permanent position, after the completion of his temporary one year position as Planner.  Connecticut courts, however, have recognized the development of liability in contract for action induced by a reliance on a promise.  See id.  Under the doctrine of promissory estoppel,

> a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Id. (citing Restatement (Second) Contracts § 90 (1981)).  The promise must be "clear and definite" and must reflect the present intent of the promisor to commit to his promise, as opposed to a mere statement of intent to contract in the future.  See id. at 221-22; see also Stewart v. Cendant Mobility Services Corp., 837 A.2d 736, 742-43 (Conn. 2003)(discussing the development of promissory estoppel under Connecticut law). "[A] mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance" and is therefore not sufficiently promissory.  837 A.2d at 742-43 (quoting 3 A. Corbin, Contracts at § 8.9).  The promise must also be clear enough that the promisor could "reasonably have expected [the promise] to induce reliance."  520 A.2d at 221.  "Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at

all." <u>Id</u>. (citation omitted).

Mr. Suntoke asserts that, during his one year working as a Planner, his supervisor and the director of training made repeated comments to him about getting him involved in training. <u>See</u> Suntoke Dep. 58-59. The issue is whether those comments amounted to a definite promise of employment upon which Plaintiff could have reasonably relied. "[T]he question of whether statements are promissory should be considered a question of fact ... " <u>Torosyan v. Boehringer Ingelheim Pharm., Inc.</u>, 662 A.2d 89, 98 n.6 (Conn. 1995). As such, where a reasonable jury could find that a promise could have induced forbearance, summary judgment should not be granted. <u>See generally</u> <u>Sparreri v. Town of Rocky Hill</u>, 579 F.Supp. 2d 326, 333 (D.Conn. 2008)(denying a motion for summary judgment where an employee of a town sued the town for breach of contract). Conversely, the court may grant summary judgment where, even taking all of plaintiff's assertions as true, plaintiff fails to articulate a promise upon which he or she relied. <u>See generally</u>, <u>Byra-Grzegorczyk v. Bristol-Myers Squibb Co.</u>, 572 F. Supp. 2d 233, 254 (D.Conn. 2008)(granting summary judgment against plaintiff who claimed that a printed company policy amounted to a promise). <u>Accord</u> <u>D'Ulisse-Cupo</u>, 520 A.2d 217 (upholding a lower court's finding that no promise had been made).

In their respective motions, Plaintiff and Defendant debate the application to this issue of two oft-cited cases from the

Connecticut Supreme Court, D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra, and Stewart v. Cendant Mobility Services Corporation, supra.   In Stewart, the court upheld a finding of promissory estoppel against an employer that had terminated an at-will employee because her husband began working for a competitor, even after her supervisor had directly told her that her husband's new job would not be an issue.   See 837 A.2d at 739-740.   The court found that a reasonable jury could have determined that her supervisor's statements manifested intent to contract and were sufficiently clear to induce reliance.   See id. at 742-45.   In D'Ulisse-Cupo, a teacher employed under a contract of fixed duration was told directly by her employer that her contract would be renewed.   See 520 A.2d at 218.   During her performance review, the principal told her that "there would be no problem with her teaching certain courses and levels the following year," and that "everything looked fine for rehire for the next year, and that she should continue her planning for the exchange program."   Id. at 218-19.   However, she was not rehired.   See id. The court upheld a finding that there was no promissory estoppel, stating that the school's offer did not reasonably induce forbearance, because there had been no discussion of the particulars of a contract, like pay, fringe benefits, etc.   See id. at 222. The principal's representations, the court determined, "manifested no present intention ... to undertake immediate

23

contractual obligations with the plaintiff." Id. at 221-22.

Here, Plaintiff failed to articulate any intent to contract on the part of PSEG. Even taking all of Mr. Suntoke's averments as true, PSEG did not promise him employment to continue beyond his one-year employment as Planner. In his deposition, Mr. Suntoke said that he did not seek other employment during his year as Planner because he was "relying entirely on that they told [him] that we will involve [him] in the training function, not once, but repeatedly." Suntoke Dep. 58-59. He claimed that his supervisor, Richard Stewart ("Stewart"), told him, "we need somebody with your experience and background and training, and we will involve you in training."[8] Suntoke Dep. 64. Further, Mr. Suntoke asserts that he asked the head of the training department at the Bridgeport Station, Ronald Couto ("Couto"), when were they "going to involve [him] in training," and that Couto always said "shortly." Id. at 59. According to Plaintiff, Couto's and Stewart's comments were made in an "enthusiastic" way. See id. Even three weeks before the termination of his temporary job, Couto told him they would "involve" him in training "shortly." See id. at 60.

Yet, nowhere does Plaintiff claim that either Stewart or Couto told him that PSEG would *employ* him as a trainer. In particular, none of the comments alleged by Mr. Suntoke in any way indicate

---

[8] The court notes that neither Plaintiff nor Defendant deposed Stewart or Couto.

24

that his work with PSEG would continue after the termination of his
year of temporary employment. Mr. Suntoke himself states that he
thought the suggestion of involving him in training had to do with
his position as Planner:

Q.   Did [Stewart] indicate to you at all whether that would be
     instead of planning, instead of the planning role, in addition
     to the planning role?
A.   No, it would be associated with planning, whether he meant
     take you away from planning and put you in training or whether
     you'll have one leg in both, *that was the assumption I made*
     [emphasis added] .... I did not have any preconceived notions
     as to how I would split my time between the two functions.  I
     never asked, and no one ever told me.

Suntoke Dep. 65-66.  Mr. Suntoke admits that he merely assumed that
his involvement "with training" meant a permanent job in the
training department:

> Nobody said anything is going to be permanent, but they said,
> you know, we will involve you in training, so it was
> *reasonable to assume* [emphasis added] that it's going to go
> beyond the end of the year, and more importantly, even as I
> was approaching my termination date, I kept asking them, what
> about training, when are you involved?  Shortly.

Id. at 60.

     Nor does Mr. Suntoke allege that he ever discussed a single
detail of employment with either Stewart or Couto.  During his year
as Planner, Mr. Suntoke was employed according to the terms of the
offer of temporary employment.  See Letter to Russi Suntoke, June
25, 2003 (Def.'s Ex. 12).  The letter encouraged him to apply for
other job opportunities within the company, or his employment would
terminate on a date certain.  See id.  Yet, in regard to the
suggestion that he be "involved" with training, there was no

written offer, and Plaintiff never asked about one.  See Suntoke Dep. 67.  He was never told if the involvement would be full-time or part-time, what the pay would be or how long the job would last. See id. at 61-62, 66.  Would he continue at-will?  By contract?  At his old Staff Engineer salary?  At the lower Planner salary?  Would he be transferred to work for Couto?  Would he have additional duties?  Would the work continue past his contract date?  The answer to those questions is not on the record.  Indeed, Mr. Suntoke does not allege that the word "job" or "employment" was ever used, merely "involve" in "training."  See Suntoke Dep. 64.

Plaintiff urges the court to apply the reasoning in Stewart, holding that an offer can be sufficiently promissory even without the discussion of specific contract terms.  See generally, 837 A.2d 743-44 (discussing D'Ulisse-Cupo, 520 A.2d 217).  Plaintiff's reliance on Stewart is misplaced; in both D'Ulisse-Cupo and Stewart, defendants used the particular language of promise in regard to employment.  In Stewart, the plaintiff very directly posed the question to her supervisor of  whether her at-will employment would continue beyond a specific event and was assured that it would.  See 837 A.2d at 739-740.  Even in D'Ulisse-Cupo, where no promissory estoppel was found, the principal had told the plaintiff directly that the school would "rehire" her.  See 520 A.2d at 218-19. By comparison, Mr. Suntoke does not claim that he had any conversation regarding continuing employment and admits

that the notion that his employment at PSEG would continue beyond his contract end-date was his own assumption. <u>See</u> Suntoke Dep. 60, 65-66. There is simply no evidence that anyone at PSEG manifested any present intent to promise Mr. Suntoke employment in the training department.

Where an identifiable offer has been made, it is a factual question for the jury to determine whether or not the offer was sufficiently promissory to induce reliance. <u>See generally</u>, <u>Torosyan</u>, 662 A.2d at 98; <u>Sparreri</u>, 579 F.Supp. 2d at 333. Where no identifiable offer has been made, the court should grant Summary Judgment. <u>See generally</u>, <u>Byra-Grzegorczyk</u>, 572 F. Supp. 2d at 254. Even taking Plaintiff's factual allegations as true, Defendant made Mr. Suntoke no offer of employment to continue beyond his one-year contract.

Summary judgment is GRANTED as to Count IV.


## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary

Judgment [Doc. No. 37] is GRANTED.


                              SO ORDERED


                     _____/s/_____

                     ELLEN BREE BURNS
                     SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 13th  day of February, 2009.